IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 MAY 12  AM 11: 20

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ AD_____

| | |
|---|---|
| COLLABORATIVE AGREEMENTS, LLC, § | |
| D/B/A OUI AGREE, § | |
| PLAINTIFF, § | |
| § | CAUSE NO. A-14-CV-356-LY |
| § | |
| § | |
| ADOBE SYSTEMS INC., § | |
| CITRIX SYSTEMS, INC., TIME § | |
| WARNER CABLE, INC. TIVO, INC., § | |
| TIME WARNER CABLE § | |
| ENTERPRISES, LLC, TIME WARNER § | |
| CABLE TEXAS, LLC, TIME WARNER § | |
| CABLE INFORMATION SYSTEMS § | |
| (TEXAS), LLC, AND TIME WARNER § | |
| CABLE INFORMATION SERVICES § | |
| (TEXAS), LLC, § | |
| DEFENDANTS. § | |

## MEMORANDUM OPINION AND ORDER REGARDING
## CLAIM CONSTRUCTION

Before the court in the above-styled and numbered cause are Plaintiff Collaborative

Agreements, LLC's ("Collaborative") Opening Brief on Claim Construction filed January 23,

2015 (Clerk's Doc. No. 77); Defendants[1] Adobe Systems Inc., Citrix Systems, Inc., Time

Warner Cable, Inc., Tivo, Inc., Time Warner Cable Ent., LLC, Time Warner Cable Texas, LLC,

Time Warner Cable Information Systems (Texas), LLC, and Time Warner Cable Information

Services (Texas), LLC's Opening Claim Construction Brief filed January 23, 2015 (Clerk's Doc.

No. 76); Collaborative's Reply Claim Construction Brief filed February 13, 2015 (Clerk's Doc.

No. 80); Adobe's Reply Brief on Claim Construction filed February 13, 2015 (Clerk's Doc.

---

[1]  For the purposes of claim construction, all Defendants present consolidated briefing and
arguments.  The court herein refers to Defendants collectively as "Adobe," except as otherwise
noted.

79); the parties' Joint Claim Construction Statement filed January 12, 2015 (Clerk's Doc. No. 75); and the claim-construction presentations of both parties.

The court held a claim-construction hearing on March 20, 2015. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996). After considering the patent and its prosecution history, the parties' claim-construction briefs, the applicable law regarding claim construction, and argument of counsel, the court now renders its order with regard to claim construction.

## I.      Introduction

The court renders this memorandum opinion and order to construe the claims of U.S. Patent No. 8,271,393 (the "'393 Patent"). Collaborative asserts claims against Adobe for infringement of the '393 Patent. The '393 Patent generally relates to a system and method for facilitating transactions between two or more parties by receiving electronic documents at a server location from a client-communication device, locking the electronic documents against future changes, and verifying the agreement of the parties to the electronic documents.

## II.     Legal Principles of Claim Construction

Determining infringement is a two-step process. *See Markman,* 52 F.3d at 976 ("[There are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . ."). First, the meaning and scope of the relevant claims must be ascertained. *Id.* Second, the properly construed claims must be compared to the accused device. *Id.* Step one, claim construction, is the current issue before the court.

2

The court construes patent claims without the aid of a jury. *See Markman* 52 F.3d at 979. The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Id.* at 1313. The person of ordinary skill in the art is deemed to have read the claim term in the context of the entire patent. *Id.* Therefore, to ascertain the meaning of claims, courts must look to the claims, the specification, and the patent's prosecution history. *Id.* at 1314–17; *Markman*, 52 F.3d at 979. Claim language guides the court's construction of claim terms. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

Claims must also be read "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal citations omitted). In the specification, a patentee may define a term to have a meaning that differs from the meaning that the term would otherwise possess. *Phillips*, 415 F.3d at 1316. In such cases, the patentee's lexicography governs. *Id.* The specification may also reveal a patentee's intent to disclaim or disavow claim scope. *Id.* Such intentions are dispositive for claim construction. *Id.*

Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiment. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. A patentee may also serve as his own lexicographer and define a disputed term in prosecuting a patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). Similarly, distinguishing the claimed invention over the prior art during prosecution indicates what the claims do not cover. *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988). The doctrine of prosecution disclaimer precludes patentees from recapturing specific meanings that were previously disclaimed during prosecution. *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). Disclaimers of claim scope must be clear and unambiguous. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002). Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises may help the court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim

term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* Extrinsic evidence may be useful when considered in the context of the intrinsic evidence, *Id.* at 1319, but it cannot "alter a claim construction dictated by a proper analysis of the intrinsic evidence," *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

III.    **Discussion**

A.    *New Matter Issue and Claim Construction*

The '393 Patent claims priority to three provisional applications. The earliest of these was filed on April 2, 2002. Application for the '393 Patent itself was filed on November 1, 2011. Over the course of filing multiple continuations on the original provisional applications, nearly two full columns have been added to the patent specification as compared to the specification of the original application. The abstract is also entirely new to the '393 Patent. This additional material was introduced by the patentee adding the text of independent claims from the '393 Patent family's previously issued patents into the body of the specification as new embodiments of the invention.

Adobe argues that the cumulative effect has been to introduce substantial new matter not entitled to the April 2, 2002 priority date. Adobe contends that the '393 Patent claims should have a priority date no earlier than November 1, 2011. Specifically, Adobe argues that the new matter changed the scope of "identity validation." However, because the parties agreed to a construction of "identity validation" at the claim-construction hearing, the court need not address this contention.

Adobe also argues that the new matter changed the scope of disputed claim term "electronic signature" and introduced a new ordering of steps that is inconsistent with the original disclosure. The court concludes that these remaining issues are not determinative of the proper construction of any disputed claim term. Whether the written description requirement is met by the '393 Patent claims is a factual determination that need not be determined as a part of the claim construction. *See Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262, 1268 (Fed. Cir. 2010) ("Determination whether a priority document contains sufficient disclosure to comply with the written description aspect of 35 U.S.C. § 112, first paragraph, is a question of fact.").

B.    *Agreed Constructions*

At the claim-construction hearing, the parties agreed to the construction of one previously disputed claim term.[2] The court hereby adopts the agreed construction of the claim term listed in the table below.[3]

| Claim Term/Phrase | Adopted Agreed Construction |
|---|---|
| "identity validation"<br><br>Claims: 1, 2, 3, 12, 13,15, 25, 26, 27, 36, 37, 38, 49, 50, 51, 60, 61, 62 | **"information that affirmatively identifies a party's identity"** |

---

[2] The parties also agreed at the claim-construction hearing to drop contentions that the term "non-transitory computer program" is indefinite.

[3] Throughout, the **bolded** terms indicate the court's adopted construction.

C.     *Disputed Terms*

The parties dispute the construction of nine terms.  The following table summarizes the

parties' proposed constructions of the disputed terms.

| Claim Term/Phrase | Collaborative's Proposed Construction | Adobe's Proposed Construction |
|---|---|---|
| 1.   "attaching the identity validation"<br><br>Claims: 1, 12, 25, 36, 49, 60 | "associating, adding, or linking to the identity validation" | "appending the identity validations from the first party and the second party to the accepted electronic document" |
| 2. "electronic signature"<br><br>Claims: 2, 3, 13, 15, 27, 37, 38, 50, 51, 61, 62 | "an electronic sound, symbol, or process attached to or logically associated with an electronic document adopted by a party to sign the electronic document" | "electronic data that is (a) received as part of the registration information; (b) created before the documents are negotiated; and (c) indicates a party has accepted certain legally binding contractual terms or conditions." |
| 3.   "locked against future changes"<br><br>Claims: 1, 12, 25, 36, 49, 60 | No construction is necessary. Plain and ordinary meaning. | "no data may be added, deleted or modified" |
| 4.   "receiving one or more electronic documents . . . via a network from a client communications device of a first party to the transaction wherein . . . all of the one or more electronic documents are locked against future changes"<br><br>Claims: 1, 25, 49 | No construction is necessary. Plain and ordinary meaning applies. | "receiving one or more locked electronic documents from the first party client communications device" |

| | | |
|---|---|---|
| 5. "whenever an acceptance of any of the one or more electronic documents is received by the server computer from the client communications device of the second party"<br><br>Claims: 1, 12, 25, 36, 49, 60 | No construction is necessary. Plain and ordinary meaning applies. | "each time an acceptance of any of the electronic document is received at the server computer from the second party's client communication device" |
| 6. "A non-transitory computer readable medium encoded with a computer program for facilitating a transaction between two or more parties comprising"<br><br>Claims: 25, 36 | The preamble is limiting. | The preamble is not a claim requirement or limitation. |
| 7. "code segment"<br><br>Claims 25, 36 | No construction is necessary. Plain and ordinary meaning applies. | Subject to construction under 35 U.S.C. § 112 ¶ 6; Indefinite. |
| 8. "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors to . . ."<br><br>Claims 49, 60 | No construction is necessary. Plain and ordinary meaning applies. | Subject to construction under 35 U.S.C. § 112 ¶ 6; Indefinite. |
| 9. "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors to . . ."<br><br>Claims 49, 60 | No construction is necessary. Plain and ordinary meaning applies. | Indefinite. |

## 1. "attaching the identity validation"

In all independent claims of the '393 Patent, after an acceptance of an electronic document by the second party is received, the identity validation from both parties is "attach[ed]" to the accepted electronic document.  The identity validation itself may include usernames, passwords, and electronic signatures.

Collaborative argues that the construction of "attaching" must be sufficiently inclusive to allow for all of the possible ways these data types can be attached to an electronic document and suggests "associating, adding, or linking."   Adobe argues that Collaborative's construction is unnecessarily broad because it replaces one word with three different words.  Adobe also argues that the identity validation must be "appended" to an electronic document because the document itself is "locked against future changes."   According to Adobe, adding material to the locked document would violate the locking limitation, thus "appending" is more appropriate than "adding."

Central to the dispute regarding this limitation is whether the identity validation is a separate file that must be appended to the locked electronic document without altering its substance, or whether the identity validation information may be inserted directly into the locked electronic document.

The claims and specification of the '393 Patent offer very little guidance on the meaning of "attaching."  Functionally, the attaching step serves to take the identity validation, which may include a legally binding electronic signature, and create a deliverable electronic document that may be provided to both parties to the transaction after agreement. '393 Patent, 17:56–58.  This function is also evident in the specification:

> During the negotiation process, the system tracks one or more changes to the electronic documents made by the parties in block 212. The system also locks all or part of the electronic documents against future changes as they are agreed upon by the parties in block 214. An electronic signature from each party that agrees to the electronic document is attached to the electronic document in block 216. *Thereafter. signed electronic documents are provided to each party* in block 218 and the process is completed in block 220.

'393 Patent, 6:32–40 (emphasis added).  The delivery of an electronic document to the respective parties indicates that the document should be self-contained. In light of this, a construction that defines merely "linking" or "associating" the document to the identity validation is overly broad. The court finds nothing further in the patent that appears to define or to limit the meaning of "attaching" to either appending or adding.  Consequently, a person of ordinary skill in the art would understand that the term encompasses both meanings.

The court construes "attaching the identity validation" to mean **"adding the identity validation into or appending the identity validation."**

## 2. "electronic signature"

Adobe argues that "electronic signature" as used in the claims of the '393 Patent is subject to a prosecution-history disclaimer made during the prosecution of U.S. Patent No. 7,562,053 (the "'053 Patent"), another patent in the '393 Patent family.  Adobe's proposed construction is taken directly from arguments made by the '053 Patent's prosecuting attorney in overcoming prior art:

> In addition, the electronic signatures described in Thomas [US 2005/0240529 A1] are created only after the electronic document is finalized. ([0081], lines 1-5). Henry [US 6,898,625] does not cure this deficiency. In contrast, *the electronic signatures used in the present invention are: (a) part of the registration process; (b) created before the documents are negotiated; and (c) legally binding as a result of the party's acceptance to the certain contractual terms and conditions.*

Reply to Office Action of Oct. 16, 2007, '053 Patent, at 14 (emphasis added).  This definition is repeated throughout the prosecution history of the '053 patent.

Collaborative argues that Adobe's construction is taken out of context from the prosecution history of a different set of claims and claim terms.  Specifically, Collaborative argues that the patentee distinguished Thomas by pointing to the claim language surrounding and affecting "electronic signature" in the context of the '053 Patent claims, not by defining electronic signature itself.

Generally, a "disclaimer made during the prosecution of a patent application may operate as a disclaimer with respect to later patents of the same family." *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013) (citing *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007)).  However, such disclaimer is irrelevant to the meaning of a limitation in a subsequent patent if the two patents do not share the same claim language. *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003).

The claims of the '053 Patent are substantially different from the claims of the '393 Patent.  The court concludes that here the prosecution disclaimer does not apply.  A review of the relevant portions of Claim 1 of the '053 Patent makes this conclusion apparent:

> 1. A method for facilitating a transaction between two or more parties comprising the steps of:
>     receiving registration information at a server computer via a network from a client computer of each party to the transaction *wherein the registration information comprises* a user name for the party, a password for the party, and acceptance to certain contractual terms and conditions that create *a legally binding electronic signature* for the party and *begins the transaction*;
>     . . .
>     whenever an acceptance of all portions of one of the posted electronic documents is received by the server computer from the client computers of all the parties, attaching *the legally binding electronic signature* from each agreed party to the agreed to and

11

> locked electronic document and providing the signed electronic
> documents to each party.

'053 Patent, 16:47–17:12  (emphasis added).  In the '053 Patent, the "legally binding electronic

signature" is received as a part of the registration information.  This is the same "legally binding

electronic signature" that is eventually attached to the locked electronic document as indicated by

the definite article "the" in the last limitation of the above claim.  Thus, the patentee's argument

during prosecution that the electronic signature is "used in . . . the registration process" adds no

new limitation to the '053 claims.

Similarly, Claim 1 of the '053 Patent requires that the "receiving registration information"

step actually "begins the transaction."  If it begins the transaction, then it necessarily precedes any

negotiation of the relevant electronic document by the parties involved.  Thus, the patentee's

prosecution arguments that the electronic signature be "created before the documents are

negotiated" also adds no new limitation to claim language.

In contrast, neither of these limitations are found within the claims of the '393 Patent.

Claim 1 exemplifies this difference in the claim language:

> 1. A method for facilitating a transaction between two or more
> parties comprising the steps of:
>     *receiving one or more electronic documents* and an identity
> validation at a server computer via a network from a client
> communications device *of a first party* to the transaction
> . . .
>     *receiving registration information* at the server computer via
> the network from the client communications device *of a second
> party* to the transaction wherein the registration information
> comprises the identity validation of the second party;
> . . . .

'393 Patent, 17:14–45 (emphasis added).  Here, the identity validation of the first party—which

may comprise an electronic signature—is not necessarily received as a part of the registration

information.  Only the second party's identity validation must be received as a part of registration information.   Furthermore, there is no explicit ordering of steps that requires the identity validation to be received *before* the parties negotiate the electronic document as there is in the '053 Patent claims.  Because of the differences in the claim language between the two patents, Adobe's prosecution disclaimer construction is rejected.

Collaborative's construction is essentially taken from the Electronic Signatures in Global and National Commerce Act (the "ESIGN Act"):

> The term "electronic signature" means an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record.

Pub. L. No. 106-229, § 106(5), 114 Stat. 464, 472 (2000) (codified at 15 U.S.C. § 7006(5)).  It is also used in Adobe's Terms-of-Use contract for the EchoSign products that have been accused of infringement in this case:

> "Electronic Signature" means the signature capability of the On-demand Services, defined to include an electronic sound, symbol, or process attached to or logically associated with an Electronic Document and executed or adopted by a person with the intent to sign the Electronic Document.

The '393 Patent specification requires only that the electronic signature be "legally binding."  '393 Patent, 6:1–4.  Because a person having ordinary skill in the art would have been aware of the legal requirements for an electronic signature as defined in the ESIGN Act, a construction consistent with language from the ESIGN Act is appropriate in this case.  The court adopts the ESIGN Act's definition of "electronic signature" and modifies it to be consistent with the language of the claims in the '393 Patent.  Specifically, the court removes "attached to or

logically associated with a contract," changes "person" to "party," and changes "record" to "electronic document."

The court concludes that "electronic signature" is construed to mean **"an electronic sound, symbol, or process executed or adopted by a party with intent to sign an electronic document."**


### 3. "locked against future changes"

The parties dispute if a locked document may be modified in any way and how long the electronic document must *remain* locked to be "locked against future changes." Adobe argues for a construction that "no data may be added, deleted, or modified" to an electronic document that has been locked against future changes. Collaborative argues that the term should be given its plain and ordinary meaning and that Adobe's construction is overly narrow, precluding document attribute updates, metadata changes, or any subsequent unlocking of the documents.

The parties' conflict may be resolved by comparing two subsets of claims within the '393 Patent. In one subset that includes Claims 1, 25, and 49, a locked electronic document is received by the server from the first party to a transaction. The second party accepts the entire electronic document and an identity validation from both parties is then attached to it.

In the second subset of claims that includes Claims 12, 36, and 60, the electronic document from the first party includes locked portions and portions that may be edited. The unlocked portions may be changed, selected, or otherwise modified by the second party and these changes are tracked. No claim limitation specifies how the first party must react to any such modifications made by the second party. Once the second party accepts the electronic document, an identity validation from both parties is attached to the electronic document.

The patent specification makes it clear that it is the substantive content of the electronic document that is locked during the negotiation process described in the claims. In general, the specification discloses a system and method for negotiating contracts with multiple terms in the form of electronic documents. *See e.g.*, '393 Patent, 6:19–23 ("These electronic documents may include a confidentiality agreement, term sheet, purchase agreement, asset purchase agreement, development agreement, license agreement or any other type of document relating to the transaction."). These terms or "portions" may be rejected by the parties or agreed to and legally adopted by electronic signature. The specification also describes a variety of different transaction types that may be covered by the patent—all of these types revolve around negotiating and signing a contract. According to the specification, the content that is required to be locked is limited to the negotiated content that defines the transaction between the parties. The extraneous metadata and document attributes are not required to be locked against future changes.

With respect to the second dispute point, the "locking" step performs the function of preventing either party from modifying portions of an electronic document or an entire electronic document. Neither the claims of the '393 Patent nor the specification contemplate unlocking of an electronic document. In fact, the patent suggests that if the original party needs to make a change to the document, then the entire negotiation process starts over with a new proposed document:

> The process, if broken down into discreet steps goes as follows.
>> Step 1. One party drafts a proposed contract or document.
>> Step 2. The proposed document is sent by some method to the other party or parties. The party in step one may have pre-signed the agreement indicating that if the party or parties in step 2 were to approve the agreement unchanged, that their signature was already in place.
>> Step 3. If the party or parties in step 2 agreed, they would sign, *or they may amend the agreement and return to the*

*originating party on step 1.* If altered, clearly the original party would not want the document to be signed without them first reviewing it.

Step 4. This cycle continues until both parties agree, then the document or contract would become binding.

A cycle of steps (2) and (3) may occur and several permutations such as either or both parties wanting their counsel to review the document, the idea of a proxy, or power of attorney signature, and other permutations common to the process.

'393 Patent, 11:4–22 (emphasis added). Although this process may be divorced from the reality of contract negotiation,[4] the claims do not cover any unlocking of an electronic document for any purpose. Nonetheless, the court notes that the transition to the preamble of all claims in the '393 Patent is "comprising," leaving the claims open ended. Any accused infringing system or method may include an unlocking step that is extraneous to the claims regardless of the present claim limitations. This makes any unlocking step—and the resulting duration of the "locked" phase—irrelevant to the construction of "locked against future changes."

The court construes "locked against future changes" to mean **"the negotiated content defining the transaction may not be modified by either party."**

---

[4] The claims of the '393 Patent depart from the reality of contract negotiation in other ways as well. The electronic document received from the first party includes locked portions and portions that may be edited. These unlocked portions may be changed, selected, or otherwise modified by the second party and are tracked by the system. Once the second party accepts the electronic document, an identity validation from both parties is attached to the electronic document. However, there is no claim limitation that requires the first party to review these modifications by the second party before the electronic signature is attached to the document.

## 4. "receiving one or more electronic documents . . . via a network from a client communications device of a first party to the transaction wherein . . . all of the one or more electronic documents are locked against future changes"

The parties dispute the plain and ordinary meaning of a claim limitation containing a wherein clause requiring that a received electronic document be locked against future changes.

> 1. A method for facilitating a transaction between two or more parties comprising the steps of:
>
> *receiving one or more electronic documents* and an identity validation at a server computer via a network from a client communications device of a first party to the transaction
>
> *wherein* (a) the client communications device comprises a computer, a workstation, a personal data assistant, an Internet-enabled phone or a wireless communications device, *(b) all of the one or more electronic documents are locked against future changes,* and (c) the identity validation of the first party indicates that the first party has agreed to the one or more electronic documents
> . . . .

'393 Patent, 17:14–45 (emphasis added).

Collaborative argues that the claim language contemplates a method that allows for an electronic document to be received from the parties to the transaction and locked subsequent to that receipt. Specifically, the language "are locked against future changes" is present tense, not past tense. Collaborative argues that had the patentee intended that the electronic document be locked upon receipt, the language would have been past tense: "were locked against future changes."

Figure 2 of the '393 Patent specification is a flow chart that supports the argument that the patentee did contemplate such a sequence of events. The specification also describes a method wherein an electronic document is received in an unlocked state and may later be locked by the

user or the system. '393 Patent, 6:17–36. However, the claim language at issue here mandates a different result.

One of the "cardinal sins" of patent law is the importation of claim limitations into the language of the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001). Here, however, the claims are actually narrower than the specification may support—leaving Collaborative to argue for a broader interpretation than the patentee actually claimed. Collaborative's claim-construction argument ignores the wherein clause that is part of the claim sentence. This clause limits the scope of the receiving step of the claim to a situation wherein certain conditions are actually met. One of the three conditions of the wherein clause in Claim 1 is that the electronic document be locked at the time it is received. For this reason, the court rejects Collaborative's argument that the "plain and ordinary" meaning contemplates receiving an unlocked document that is subsequently locked. The court will not allow future argument in this case that the plain and ordinary meaning of this term allows for the breadth of interpretation Collaborative seeks here. *See Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206–07 (upholding claim construction of plain and ordinary meaning where district court prevented expert from reconstruing term at trial).

On the other hand, Adobe's proposed construction attempts to rewrite and simplify claim language that, although lengthy and complex, is capable of being readily understood by a person of skill in the art. The court declines to rewrite the claim language in the way Adobe seeks.

18

The court therefore concludes that "receiving one or more electronic documents . . . via a network from a client communications device of a first party to the transaction wherein . . . all of the one or more electronic documents are locked against future changes" should be given its **plain and ordinary meaning**, with no further construction required.


**5. "whenever an acceptance of any of the one or more electronic documents is received by the server computer from the client communications device of the second party"**

The parties' dispute primarily focuses on the meaning of "whenever" and the frequency with which the attaching step must follow the acceptance step. Collaborative argues for an "open" construction of the term. Because of the claim transition "comprising," Collaborative argues that the claim limitation is met if there is a single instance of the attaching step following the acceptance step. Adobe's construction of the term requires that the attaching step follow the acceptance step each and every time an acceptance is received in order to meet the claim limitation.

Although Adobe's construction of "each time" accurately reflects *a* meaning of "whenever," the claims themselves require a more nuanced construction than adopting Adobe's construction in its entirety. The '393 Patent contains six independent claims of three claim types: two method claims, two apparatus claims, and two system claims. In all three types of claims, the patentee appears to have relied heavily on the same claim language and adopted it to suit the unique requirements for drafting each of these three claim types. Although this practice may have facilitated claim drafting, the use of the term "whenever" in the method claims is inconsistent with the use of the same term in the system and apparatus claims.

Consider "each time" in exemplary claims 1 and 25:

> 1. A method for facilitating a transaction between two or more parties comprising the steps of:
>
> > . . .
> > providing the second party with access to the received electronic documents; and
> > *whenever an acceptance of any of the one or more electronic documents is received by the server computer from the client communications device of the second party,* attaching the identity validation from the first party and the second party to the accepted one or more electronic documents.

'393 Patent, 17:14–45 (emphasis added).

> 25. A non-transitory computer readable medium encoded with a computer program for facilitating a transaction between two or more parties comprising:
>
> > . . .
> > a code segment for *whenever an acceptance of any of the one or more electronic documents is received by the server computer from the client communications device of the second party,* attaching the identity validation from the first party and the second party to the accepted one or more electronic documents.

'393 Patent, 19:47–20:12 (emphasis added).

In the method claims (Claims 1–24), whenever cannot mean "each time" because a method claim is concerned only with individual and discreet steps. A method claim is practiced if each of the steps of the method are performed even a single time. If "whenever" in the method claims means "each time" or "every time," consistent with its plain and ordinary meaning, the individual and discreet steps of the method could never be practiced. Each time an acceptance was received, the method would require knowledge of some future acceptance to determine if the method had actually been practiced at the present time. This construction is inconsistent with the nature of method claims. A construction of "whenever" to mean simply "when" resolves this conflict and is internally consistent with the language of the method claims.

20

On the other hand, a system or an apparatus claim can be configured so that the attaching function follows the accepting function each time an acceptance is received. No future condition or qualification need be met. A system configured to perform the attaching step only some of the time an acceptance is received would not fall within the meaning of this claim language.

The court construes "whenever" in the method claims (Claims 1–24) to mean **"when."** The court further construes the term "whenever" in the system and apparatus claims (Claims 25–72) to mean **"each time."** The remainder of the disputed claim term is to be given its **plain and ordinary meaning**, with no further construction required.

### 6. "A non-transitory computer readable medium encoded with a computer program for facilitating a transaction between two or more parties comprising"

All of the independent claims of the '393 Patent contain a preamble that lists "a transaction." Collaborative argues that because "a transaction" forms the antecedent basis for "the transaction" as used in the body of the claims, the preamble should be limiting. Collaborative further argues that without a limiting preamble, the claims are "nonsensical." Interestingly, Collaborative only makes this argument with respect to claims 25 and 36, even though each independent claim in the patent suffers from the same antecedent-basis problem.

A "preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted). If limitations in the body of the claim derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention. *See, e.g.*, *Electro Sci. Indus. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1348 (Fed. Cir. 2002). On the other hand, "[i]f the body of the claim sets out

the complete invention," then the language of the preamble may be superfluous. *Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1310, 64 USPQ2d 1832, 1837 (Fed. Cir. 2002). A preamble does not limit the claim when the claim body describes a structurally complete invention and the preamble only states a purpose or an intended use for the invention. *Catalina Mktg.* 289 F.3d at 808.

Adobe argues that the second portion of the preamble, "for facilitating a transaction between two or more parties," is a statement of intended use and cannot limit the claims even if it were found in the body of the claim. Adobe contends that the antecedent-basis argument is irrelevant, because "a transaction" is only stated within the context of an intended use statement. Adobe also directs the court to *Marrin v. Griffin*, where the Court of Appeals for the Federal Circuit held that a patent preamble's "for permitting" language was not limiting, reasoning that "the mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim." 599 F.3d 1290, 1295 (Fed. Cir. 2010).

The court finds Collaborative's position compelling. Although the preamble is a statement of intended use and ordinarily would not be limiting, it does contain the antecedent basis for a necessary component of the claimed invention, "the transaction." Claim 25, for example, recites "a code segment for assigning the transaction to an account on the server computer." This use of "transaction" requires the conclusion that "a transaction" in the preamble is more than simply an intended use statement. The preamble defines an actual element of the claim that is necessary for understanding the scope of the claimed invention and practicing the claims. Without an explicit transaction element, the claim cannot be practiced in its entirety. Thus, the preamble is limiting.

Additionally, every independent claim in the '393 Patent suffers from the same antecedent-basis problem. The court therefore concludes that **the preambles in Claims 1, 12, 25, 36, 49, and 60 are limiting**.

### 7. "code segment"

Claims 25 through 48 claim an article of manufacture, namely a nontransitory computer-readable medium encoded with a computer program. This computer-readable medium is encoded with "code segments for" achieving specific functions such as receiving an electronic document at a server computer, assigning a transaction to an account on the computer server, and providing access to the electronic document.

Adobe argues that this use of the "code segment" language in the above claims invokes the means-plus-function claiming technique, despite not specifically using the phrase "means for." 35 U.S.C. § 112 ¶ 6. Because the specification does not disclose algorithmic structure to support the means-plus-function language in the claim, Adobe further argues, the claims are indefinite.

When a patentee does not use the language "means for" in a claim limitation, there is a presumption that Section 112 ¶ 6 does not apply. *See Personalized Media Commc'ns, LLC v. International Trade Commission*, 161 F.3d 696, 703–04 (Fed. Cir. 1998). This presumption is "a strong one that is not readily overcome." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004). However, the presumption may be overcome if "skilled artisans, after reading the patent, would conclude that [the] claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming." *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011).

Adobe's position is that "code segment" cannot be structural because a code segment is a generic placeholder that does not perform the functions recited in the claims.  Adobe contends that code segment is a nonce word because there would be no difference in claimed *structure* if the claims recited "a code segment means for" rather than "a code segment for."

Collaborative argues that code segment is sufficiently structural to a person of ordinary skill in the art.  In support of this, Collaborative directs the court to Microsoft Press Computer Dictionary 3rd Edition (1997) that defines "code segment" as "[a] memory segment containing program instructions" or "a named and segregated portion of a program's code typically performing a specific class of operations." The same dictionary defines "segment" as "[a] section of a program, that, when compiled, occupies a contiguous address space and that is usually position independent."  Collaborative further argues that a code segment is sufficiently structural because it is part of a "non-transitory computer readable medium"—a physical structure.

Collaborative also points to the function of a code segment in the claims as evidence of a code segment's structure.  When executed, Collaborative argues, a code segment operates to transmit and receive specific data between a server and a client computer within a network. Collaborative contends that these functions signify to those skilled in the art that a code segment itself is structural, even if described with a high degree of generality.

A claimed expression cannot be said to be devoid of structure if it is used "in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359–60; *see also Williamson v. Citrix Online, LLC*, 770 F.3d 1371, 1379 (Fed. Cir. 2014) (holding that "the word 'module' has understood dictionary meanings as connoting either hardware or *software structure* to those skilled in the computer arts") (emphasis

added); *but see Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099–1101 (Fed. Cir. 2014) (holding that claim terms "program recognition device" and "program loading device" are means-plus-function terms because they fail to connote sufficient structure either in the form of hardware or software).

Courts have consistently interpreted "software" and similar terms to have sufficient structure so as to avoid an invocation of Section 112 ¶ 6. *See Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1359–60 (Fed. Cir. 2011) (overturning district court finding that "computing unit" invoked ¶ 6); *Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, No. 04 C 5312, 2006 WL 3147697, at *11 (N.D. Ill. Oct. 31, 2006) (finding "code" did not invoke ¶ 6 in a computer-readable medium claim) *aff'd*, 595 F.3d 1340 (Fed. Cir. 2010); *WhitServe LLC v. GoDaddy.com, Inc.*, No. 3:11-CV-00948, 2014 WL 5668335, at *4 (D. Conn. Nov. 4, 2014) (finding "software executing on said computer" did not invoke ¶ 6); *RLIS, Inc. v. Allscripts Healthcare Solutions, Inc.*, Nos. 3:12–CV–208, 3:12–CV–209, 2013 WL 3772472, at *14 (S.D. Tex. July 16, 2013) (finding "computer system under software control," "computer executable database software," "an editing software utility," "executable software," and "computer software" did not invoke ¶ 6); *Eolas Techs., Inc. v. Adobe Sys., Inc.*, 810 F.Supp.2d 795, 810 (E.D. Tex. 2011) (finding "computer readable program code" did not invoke ¶ 6); *Aloft Media, LLC v. Adobe Sys., Inc.*, 570 F.Supp.2d 887, 898 (E.D. Tex. 2008) (finding "computer code" did not invoke ¶ 6).

The recent *Williamson* case is strongly in favor of Collaborative's position that "code segments" are structural. In *Williamson*, the Federal Circuit considered a patent claim covering a "system for conducting distributed learning among a plurality of computer systems coupled to a network." 770 F.3d at 1375. A limitation of the claim required "a *distributed learning control*

25

*module* for receiving communications transmitted between the presenter and the audience member computer systems . . . ." *Id.* In finding "module" to be sufficiently structural as to not invoke ¶ 6, the Federal Circuit considered how a person of ordinary skill in the art would have understood module, determined that module was a subpart of a definite structure, and examined module's function in the context in the claims. *Id.* at 1379–80.

First, the Federal Circuit reasoned that because module "has understood dictionary meanings as connoting either hardware or *software structure* to those skilled in the computer arts," the lower court erred by finding that the term "module" was entirely nonstructural. *Id.* (emphasis added). The dictionary definitions for "module" cited by the court included "part of a program that usually performs a particular function or related functions" and "self-contained hardware or software component that interfaces with a larger system." *Id.* at 1379.

Second, the circuit considered the entire term, "distributed learning control module," in the context of the claims. This "distributed learning control module" was claimed as a subpart of a "distributed learning server," a definite physical structure. *Id.* at 1380.

Third, the circuit examined the function of the "distributed learning control module" as described in the specification and claims. *Id.* The "distributed learning control module" "receive[s] communications transmitted between the presenter and the audience member computer systems," "relay[s] the communications to an intended receiving computing system," and "coordinat[es] the operation of the streaming data module." *Id.* These "interconnections and intercommunications" supported the conclusion that "one of ordinary skill in the art would understand the expression 'distributed learning control module' to connote structure." *Id.* Based on these considerations, the court held that module would be understood by one of skill in the art to be structural and patentee did not invoke Section 112 ¶ 6 by its use. *Id.*

Applying the approach taken in *Williamson* to this set of disputed claims, the court concludes that the presumption against invoking Section 112 ¶ 6 by not using the language "means for" stands intact. The patentee of the '393 Patent did not invoke Section 112 ¶ 6 with his use of "code segment." The dictionary definitions cited by Collaborative suggest to the court that a person of ordinary skill in the art would most likely understand code segment to connote software structure. "Code segment" refers to a portion of a larger program that, similar to a module, has a specific purpose or performs a specific class of operations. Each code segment is also claimed as a part of a nontransitory computer-readable medium. A code segment occupies physical memory space on a computer-readable medium. Lastly, a code segment in the '393 Patent functions to receive and process data, similar to the "interconnections and intercommunications" function of "module" in *Williamson*.

The court construes "code segment" to **not invoke 35 U.S.C. § 112 ¶ 6**. The court further concludes that the claims containing "code segment" are **not indefinite**.

## 8. "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors to . . . "

In an argument similar to the "code segment" dispute above, Adobe argues that claims 49 through 72 (the "systems claims") also lack sufficient structure to avoid invoking Section 112 ¶ 6. Collaborative similarly relies on the presumption against invoking Section 112 ¶ 6 by not having used "means for" language in the claim.

Adobe's argument is slightly different than its argument regarding the code-segment language, because Adobe does not point to a particular nonce word used in place of "means for." Instead, Adobe's position is that the entire reference to a nontransitory computer-readable

27

medium is a nonce word and that such a generic reference cannot support the operative functions of the systems claims.

Collaborative is also in a slightly different position because it cannot rely on the software structure inherent in the code-segment language because it is not used in the systems claims.

Nevertheless, the result is the same. The '393 Patent's systems claims are essentially a method carried out on an apparatus by a computer-implemented software code contained on a storage device as in the code-segment claims. This is a standard claiming technique that has been repeatedly upheld as definite. *See e.g., Netscape Commc'ns Corp. v. ValueClick, Inc.*, 684 F. Supp. 2d 699, 722 (E.D. Va. Jan. 29, 2010) (finding that claimed computer systems with processors and computer-readable medium encoded with instructions for performing a method were not indefinite); *SmartPhone Technologies LLC v. HTC Corp.*, No. 6:10-CV-580, 2013 WL 1136972, at *14 (E.D. Tex. Mar. 18, 2013) (finding similarly structured claims definite).

The systems claims in the '393 Patent recite a network interface, processors, and storage devices, and incorporate a computer readable medium encoded with instructions. This computer-readable medium is essentially the same as the computer-readable mediums of claims 25 and 36 except for the lack of the "code segment" term. Similar to the argument about the previous term, the computer-readable medium can refer to both software structure and physical structure as a part of an article of manufacture. Both are "structural" enough to maintain the presumption against means-plus-function claiming.

The court construes "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors . . ." to **not invoke 35 U.S.C. § 112 ¶ 6**. The court further concludes that the claims containing "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors . . ." are **not indefinite**.

### 9. antecedent basis of "server computer" in systems claims

Adobe argues the term "server computer" used in the systems claims lacks antecedent basis and renders the systems claims indefinite. Adobe contends that even if the antecedent-basis problem were corrected by replacing "the" with "a," the claims are still indefinite because there is no way to determine what "the server computer" refers to within the claim. According to Adobe, it is not clear whether "the server computer" is the system that is the subject of the entire claim or whether there is an external server computer outside the claimed system with which the system is communicating. Thus, Adobe argues that because there is no way to tell the scope of the claims with reasonable certainty, the systems claims are invalid under *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S.Ct. 2120 (2014).

Collaborative argues that distributed computing systems are common and would be known to persons of ordinary skill in the art. Collaborative urges that the lack of antecedent basis for "server computer" does not necessarily render the claim indefinite because a person of ordinary skill in the art would understand that a server computer would necessarily be a part of a distributed computing system.

Courts generally address indefiniteness during claim construction. *Praxair, Inc. v. Atmi, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008). The claims of a patent must "particularly point[] out

and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C.

§ 112, ¶ 2.  Specifically, "a patent is invalid for indefiniteness if its claims, read in light of the

patent's specification and prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134

S.Ct. 2120, 2123 (2014).

Two competing interpretations of the claims are contemplated by Collaborative and

Adobe.  In one interpretation, the system and server computer are different devices.  This is a

problematic reading of the claims because the only other "system" with which a server computer

communicates, as contemplated by the '393 Patent claims and specification, is a client device, not

another server computer or system.  *See* '393 Patent, Figure 1, 5:33–57.  The patent does not

disclose any knowledge or reference to the "cloud computing" networks mentioned by

Collaborative in its briefing.  A reading of the claims that requires such knowledge, if it existed in

2002, might well be within the knowledge of one of ordinary skill in the art.  However, such a

reading would also render the claim invalid for lack of written description.  This interpretation of

the claims is untenable and the court rejects it.

In the second interpretation, the systems claims of the '393 Patent only contemplate one

server computer, which is itself the claimed "system" of claims 49 and 60.  Contrary to Adobe's

arguments, this reading of the claims, while needlessly self-referential, does not present any

difficulties of continuity.  An examination of Claim 49 demonstrates this:  The system of Claim

49 includes a network interface, processors, and a nontransitory computer-readable medium.  "A

system" is coupled to the processors to "receive registration information at the server computer

via the network from the client communications device of a second party to the transaction. . . ."

Replacing "the server computer" with "the system" clarifies that the system itself is the device

that is receiving the registration information via the network interface.  "A system" is now coupled to the processors to "receive registration information at the system via the network from the client communications device of a second party to the transaction. . . ."  No other server computer is involved; the system is simply configured to receive registration information.

Another potential problem Adobe raises is resolved by the latter interpretation.  In Claim 49, the system "receives one or more electronic documents" and subsequently "post[s] the received electronic documents to the account on the server computer."  Adobe argues there is no way to know the structural relationship between the receiving system and the posting server computer.  However, if they are the same system, the structural relation is clear.

Reading the system and server computer as synonymous is also supported by independent Claims 1, 12, 25, and 36.  In each of these claims, there is only a single server computer that interacts with a client-communication device and the same server computer performs all other functions recited in the claims.  Given the similarities between the systems claims and rest of the claims in the '393 Patent, a person of ordinary skill in the art would understand that "a system" and "the server computer" are synonymous references.

Accordingly, the court concludes that the antecedent basis of "the server computer" in Claims 49–72 is found in the "A system" language of the preambles.  The court further concludes that the system claims are **not indefinite**.

D.     *Summary Table of Adopted Agreed and Disputed Terms*

| Claim Term/Phrase | Court's Construction |
|---|---|
| "identity validation"<br><br>Claims: 1, 2, 3, 12, 13,15, 25, 26, 27, 36, 37, 38, 49, 50, 51, 60, 61, 62 | **"information that affirmatively identifies a party's identity"** |
| "attaching the identity validation"<br><br>Claims: 1, 12, 25, 36, 49, 60 | **"adding the identity validation into or appending the identity validation"** |
| "electronic signature"<br><br>Claims: 2, 3, 13, 15, 27, 37, 38, 50, 51, 61, 62 | **"an electronic sound, symbol, or process executed or adopted by a party with intent to sign an electronic document."** |
| "locked against future changes"<br><br>Claims: 1, 12, 25, 36, 49, 60 | **"the negotiated content defining the transaction may not be modified by either party"** |
| "receiving one or more electronic documents . . . via a network from a client communications device of a first party to the transaction wherein . . . all of the one or more electronic documents are locked against future changes"<br><br>Claims: 1, 25, 49 | **Plain and ordinary meaning.** |

| | |
|---|---|
| "whenever an acceptance of any of the one or more electronic documents is received by the server computer from the client communications device of the second party"<br><br>Claims: 1, 12, 25, 36, 49, 60 | **"whenever" in Claims 1 and 12 means "when"**<br><br>**"whenever" in Claims 25, 36, 49, and 60 means "each time"**<br><br>**Plain and ordinary meaning as to the rest of the claim language.** |
| "A non-transitory computer readable medium encoded with a computer program for facilitating a transaction between two or more parties comprising"<br><br>Claims: 1, 12, 25, 36, 49, 60 | **The preamble is limiting.** |
| "code segment"<br><br>Claims 25, 36 | **Does not invoke 35 U.S.C. § 112 ¶ 6; not indefinite.** |
| "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors to . . ."<br><br>Claims 49, 60 | **Does not invoke 35 U.S.C. § 112 ¶ 6; not indefinite.** |
| "a non-transitory computer readable medium encoded with a computer program communicably coupled to the processors to . . ."<br><br>Claims 49, 60 | **Not indefinite.** |

## IV.    Conclusion

For the above reasons, the court construes the disputed claims as noted and so **ORDERS**. No further claim terms require construction.

**IT IS FURTHER ORDERED** that this case is set for a **Scheduling Conference** on **July 7, 2015, at 9:30 a.m.**, in Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701. The parties shall meet and confer in advance of that date in an attempt to settle this case. If the case is not settled, the parties shall confer in an attempt to reach agreement on a schedule to follow for the remainder of this case. The court will render a Scheduling Order as a result of the **July 7, 2015** conference.

SIGNED this *12th* day of May, 2015.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE